UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAY STARKWEATHER,

        Petitioner

   v.                                      Case No. 07-C-513

JUDY SMITH,

        Respondent.

**DECISION AND ORDER**

      Petitioner Jay Starkweather was convicted in Dunn County Circuit Court of first degree intentional homicide, four counts of attempted first degree intentional homicide, and reckless endangerment. He was sentenced to life imprisonment plus five years and is currently incarcerated at Oshkosh Correctional Institution. He brought this habeas petition under 28 U.S.C. § 2254, asserting that his state court conviction was in violation of the Constitution. Following some disputes about the proper scope of the record, the case is before me for resolution.

**I. BACKGROUND**

      This case arises out of a shooting spree that occurred on June 6, 1995. The jury concluded that Starkweather shot two of his friends – Marty Austreng and Wayne Kittleson – and then shot and killed Ted Demery, also a friend, before he was shot and wounded by two police officers, whom he had also attempted to shoot. The jury found Starkweather guilty of the six separate charges arising out of the shootings in Phase I of his trial and rejected the defense that he was not responsible for his actions by reason of mental disease or defect in Phase II. The shootings

evidently arose out of a property dispute – or perceived dispute – Starkweather was having at the time. In particular, the petitioner lived in an apartment in a Dunn County building on lake property, known as Pick-Nick Point, owned by his father. Starkweather believed the property consisted of some fourteen acres. Apparently, he had plans for developing the property and began researching the extent of his father's property rights. He soon discovered what he thought was a large conspiracy to take the land and, according to Starkweather himself, he became paranoid and thought he was in great danger. On the day of the shootings, Starkweather was very agitated and made unusual remarks to his friend Marty Austreng, the gist of which was that Austreng could have some of the property at issue. Austreng then came to Starkweather's apartment and threw down the keys to the property, stating that he did not want it. Starkweather then pulled a gun on Austreng and shot him; he also shot Wayne Kittleson, who had been sitting in Starkweather's kitchen.

Austreng ran away and Starkweather pursued him. During the pursuit, he entered the house of the Wheelock family, who rented a house on the property. Rebecca Wheelock testified that Starkweather was wielding two guns and looked "insane." After he left, she heard a single gun shot from the direction of Ted Demery's trailer. The police soon arrived and a gunfight ensued. Starkweather was injured and subdued in the shootout, and police soon discovered Ted Demery's dead body with a single shot to the face at very close range. Additional facts pertinent to the trial itself are set forth below.

## II. ANALYSIS

Starkweather asserts four claims. Three of the claims are that his attorneys were ineffective for failing to introduce evidence; failing to allow/advise Starkweather to testify during Phase I of

2

his trial; and failing to argue that the trial judge should have given a lesser-included offense instruction. Starkweather's fourth claim challenges the sufficiency of the evidence underlying his conviction.

The parties agree that Starkweather's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, if a state court adjudicated a constitutional claim on the merits, a federal court may grant habeas relief only if the state court decision was contrary to, or involved an unreasonable application of, Supreme Court precedent or if the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state proceeding. 28 U.S.C. § 2254(d); *see also Williams v. Taylor,* 529 U.S. 362, 376-77 (2000). The petitioner bears the burden of proving that the state courts' application of federal law was unreasonable, and the "unreasonable application" prong of § 2254(d) "is a difficult standard to meet." *Jackson v. Frank,* 348 F.3d 658, 662 (7th Cir.2003).

**A. Failure to Testify During Phase I**

**1. The Nature of the Claim**

The first claim asserts that trial counsel's advice to Starkweather that he not testify during phase I of the trial was "wrong" and "inaccurate." This advice led to Starkweather's unknowing waiver of his right to testify.

In any case involving more than ten years of appeals and post-conviction proceedings, it is perhaps inevitable that there are now more disputes about what has been argued *since* the trial than about what happened at the trial itself. One of these disputes involves petitioner's first claim. The claim is partially clothed in the language of ineffective assistance, but it actually seems Starkweather is attempting to assert that his waiver of the right to testify was not knowing and voluntary. In other

3

words, Starkweather is not exactly asserting ineffective assistance of counsel so much as a claim based on an involuntary waiver of the right to testify *based* on the ineffective assistance of counsel.

The respondent protests that Starkweather presented the argument differently to the state courts. In particular, the issue of waiving the right to testify was presented solely as an ineffective assistance of counsel claim, and that is how the state courts treated it. Because Starkweather never presented any independent "involuntary waiver" claim to the state courts, the claim is not properly exhausted. (Resp. Br. at 14 n.4.)

Regardless of how it was presented to the state courts, however, it seems clear that the claim is, in its essence, an ineffective assistance claim. *Winfield v. Roper,* 460 F.3d 1026, 1035 (8th Cir. 2006) ("Winfield seems to argue that the asserted failure of counsel to allow him to testify was a due process violation, but such claims are more properly framed as ineffective assistance claims to be evaluated under *Strickland*.") Starkweather does not assert that counsel lied or otherwise prohibited his client from testifying, nor does he assert that some other impediment existed that prevented his testimony. Indeed, the record reflects that the trial court had a colloquy with Starkweather outside the presence of the jury to insure that he understood his right to testify and that his waiver was voluntary. Starkweather acknowledged that he understood his right to testify and stated "I waive my right." (Pet. Br. Attach. 2 at 14-16.) To the extent his waiver of the right to testify may have been an unknowing one, the only thing that renders it so is counsel's allegedly bad legal advice. The ineffective assistance of counsel claim is thus the *sine qua non* of the involuntary waiver claim, and it therefore makes sense that when a defendant asserts that his counsel interfered with his right to testify, "[t]he appropriate vehicle for such claims is a claim of ineffective assistance of counsel under *Strickland*." *United States v. Brown,* 217 F.3d 247, 258-59 (5th Cir. 2000).

4

In *Barrow v. Uchtman,* 398 F.3d 597, 608 (7th Cir. 2005)*,* the habeas petitioner claimed that "his decision not to testify, based on his lawyer's 'ridiculous' advice, was not intelligent or informed and thus constituted a violation of his constitutional right to present testimony." Nevertheless, despite the petitioner's attempt to clothe the claim in terms of his due process right to present testimony, the Seventh Circuit addressed the claim solely in terms of ineffective assistance. Importantly, the court applied both of *Strickland*'s prongs (see below) and found that any deficient performance regarding testimony did not impact the outcome of the trial. "Here, it is clear that Barrow elected not to testify based on his lawyer's admittedly mistaken legal advice. However, as discussed above, it also seems clear that Barrow's claims regarding counsel's failure to call him as a witness do not entitle him to relief, even under de novo review." *Id.*[1] Accordingly, based on the above, I will address the claim as an ineffective assistance claim and apply the familiar *Strickland* framework.

**2. Ineffective Assistance for Advising Petitioner not to Testify**

Claims of ineffective assistance of counsel are evaluated under a familiar two-prong analysis announced in *Strickland v. Washington*. 466 U.S. 668 (1984). Under *Strickland*, "a claimant must prove (1) that his attorney's performance fell below an objective standard of reasonableness and (2) that the attorney's deficient performance prejudiced the defendant such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *McDowell v. Kingston,* 497 F.3d 757, 761 (7th Cir. 2007) (quoting *Strickland,* 466 U.S. at 694).

---

[1] That court further suggested that prejudice could not be demonstrated merely by showing that the defendant was precluded from testifying. Instead, the *outcome* of the trial is what counts. *Id.* at n.12.

The *Strickland* analysis itself presumes that counsel performed adequately, and courts thus exercise a certain degree of deference to the on-the-ground decisions made by trial and appellate attorneys. In addition, as noted earlier, AEDPA provides an additional level of deference – federal habeas courts under AEDPA are instructed to defer to the state courts' resolution of ineffective assistance challenges. *See United States v. Pierson,* 267 F.3d 544, 557 (7th Cir.2001) (noting "element of deference to counsel's choices in conducting the litigation" in combination with the "layer of respect" added by 28 U.S.C. § 2254(d)(1)).

The petitioner's first ineffective assistance claim asserts that his attorney wrongly convinced him not to testify in Phase I, even though his testimony that he fired at Austreng, Kittleson and the police in self-defense was only relevant to that phase of the trial. As such, because the self-defense testimony had no bearing on Phase II, Starkweather had secured no strategic advantage by waiving the right to testify during Phase I.

The trial court essentially reviewed this claim twice. First, following the trial, the court summarily rejected the claim of ineffective assistance of counsel. It concluded that counsel was "very professional" and "excellent." (Answer, Ex. H at App. 19.)[2] Several years later, the trial court found appellate counsel was not ineffective for failing to raise the claim of ineffective assistance of trial counsel.

> There is sufficient reason to believe, based on the record, that the trial counsel had explained to the defendant that it would be important for him not to testify in order to preserve the mental defect defense. Furthermore, even if the defendant had

---

[2] Most of the relevant state court opinions are attached to the petition itself, although they are not numbered as exhibits. Herein, the original November 3, 1998 decision on appeal is referred to as exhibit 1; exhibit 3 is the February, 12, 2003 decision of the court of appeals; trial court's denial of the § 974.06 motion is called exhibit 7; and the court of appeals' February 13, 2007 affirmance of that decision is exhibit 8.

6

> testified in phase I, it is unlikely that his largely uncorroborated testimony would have created reasonable doubt in the minds of the jurors given the evidence against him.

(Petition, Ex. 7 at 9.)

On direct appeal, the court of appeals concurred, concluding that "Starkweather's counsel made a strategic decision to wait until the second phase to testify, and this recommendation had a reasonable basis." (Petition, Ex. 1 at 16.) In the appeal from the trial court's denial of the § 974.06 motion, the court of appeals viewed Starkweather's argument as procedurally barred. That court viewed his claim that his waiver of the right to testify was unknowing and involuntary due to his trial counsel's ineffectiveness as "nothing more than an artful rephrasing of the issue that has already been decided [on direct appeal]." (Petition, Ex. 8 at 5.)

As noted, Starkweather believes his testimony that he shot Austreng and Kittleson in self-defense was testimony relevant *only* to Phase I of the trial. Evidence of self-defense could exonerate Starkweather of the crimes, but counsel could easily have believed that the jury would have disregarded his testimony altogether, given the crime scene and strong evidence against him. In that event, counsel could also have believed that Starkweather's exonerating testimony would at least partially undermine the jury's confidence in the defendant's truthfulness, and counsel could have preferred that the jury see a "fresh" defendant in Phase II rather than one whose testimony it had already found incredible. Moreover, it should be noted that the exonerating self-defense testimony would not be completely consistent with the Phase II testimony. The self-defense testimony, if believed, would cause a jury to conclude that Starkweather was reasonably in danger for his own life. In contrast, the responsibility analysis in Phase II would require the jury to find that Starkweather could not appreciate the wrongfulness of his conduct or conform his conduct to the

7

requirements of the law. Wis. Stat. § 971.15(1). If Starkweather were to successfully persuade the jury that he could not appreciate the nature of his actions, it would be difficult for him to do so after already attempting to persuade them that his actions *were* reasonably justified by a legitimate need for self-defense. Put another way, in Phase I Starkweather would be arguing his conduct was not wrong, while in Phase II he would have to argue that it was wrong, but he either did not appreciate its wrongfulness or could not control himself.

More importantly, counsel's decision to encourage Starkweather to waive his right to testify in Phase I can only be viewed with reference to what Starkweather would actually testify to in Phase II. He testified that he believed there was a conspiracy to deprive his father of his land and that he feared Austreng and Kittleson. Counsel could have believed that even if there was no reasonable basis for Starkweather to shoot Austreng and Kittleson, Starkweather may have *perceived* such a basis, given his mental state at the time. With that in mind, it made sense for counsel to forego having Starkweather testify that he *actually* shot them in self-defense and attempt to explain to the jury why he *thought* he was defending himself. As the state courts found, this was a reasonable strategy.

Similarly, counsel could have chosen to have Starkweather wait until the responsibility phase to testify that he did not shoot Demery. As set forth more fully below, the evidence with respect to Demery was quite damning. Counsel could reasonably have preferred to have Starkweather hold off on testifying that he wasn't involved with Demery's murder and instead try to convince the jury that he was suffering from a mental defect that relieved him of criminal responsibility for the act. As the state notes, and as the state courts have found, it is highly unlikely that any jury would have believed Starkweather if he testified that he: (1) shot two people in self-

8

defense; and then (2) happened upon a murder scene in which he was completely uninvolved. It is not surprising that counsel chose to fight the case on the mental state issue rather than having Starkweather deny involvement as to one crime and claiming that the other two crimes were justified by self-defense. Denying responsibility under the facts presented would have been futile and could have turned the jury against Starkweather even more. In sum, in concluding that counsel's performance was not deficient, the state courts applied *Strickland* reasonably.[3]

**B. Sufficiency of the Evidence**

Starkweather's second claim asserts that there was insufficient evidence to allow the jury to conclude that he had intentionally shot Ted Demery. Any sufficiency of the evidence challenge involves significant deference to the jury's verdict, and the conviction may not be overturned unless no rational jury could have found all of the essential elements of the crime. *Jackson v Virginia,* 443 U.S. 307, 319 (1979). In making such a determination, the reviewing court views the evidence in the light most favorable to the prosecution. *Id.*

On federal habeas review, the level of deference is arguably even stronger. The question is not left to this court's independent judgment to determine whether the jury got it right; instead, the question is "whether the Wisconsin Court of Appeals' decision . . . that a rational jury could have convicted [the defendant] based on this record resulted from an objectively unreasonable application of *Jackson*." *Piaskowski v. Bett,* 256 F.3d 687, 691 (7th Cir. 2001).

Starkweather's insufficiency claim is based on the fact that there were no witnesses to the murder and no apparent motive for Starkweather to shoot Demery, his friend. To conclude that

---

[3] The same result would hold true, of course, even if there were an independent right-to-testify claim before me. Because counsel's advice was sound, it did not render Starkweather's waiver unknowing.

9

Starkweather had intentionally killed Demery, he claims, the jury would have had nothing to go on but mere speculation.

Starkweather's insufficiency claim is barely plausible on its face, but it fails utterly when the evidence is considered in the context of the facts the jury was presented with. The context is crucial. It was not as though Demery were killed with no witnesses while the two friends were away together on an otherwise peaceful hunting trip. Instead, Demery was killed while Starkweather was in the middle of shooting rampage. He had already shot two people, supposedly his friends, and was in the process of hunting for one of them. He had entered his father's house in a rage, wielding his gun and making threats, and he took his father's gun and ammunition when he left. An officer who had arrived on the scene heard a shot, and gunfire with Starkweather soon ensued. When Starkweather was wounded and subdued, the police found Demery, shot in the face, lying in a pool of fresh blood in his own trailer. The evidence showed that he had been shot with the .380 gun found at Starkweather's feet.

Starkweather essentially concedes that the jury could have found that he shot Demery, but believes they had no basis for finding that he *intentionally* shot Demery. That is simply not true. It is obviously within the bounds of reasonableness for a jury to discern intent when a victim is shot in the head at close range by another man in the midst of a shooting spree. The fact that they may have been friends is only a piece of evidence in Starkweather's favor – it does not somehow undermine the rationality of the jury's reasonable conclusion. In Starkweather's view, a criminal defendant would be entitled to a presumption that any unwitnessed killing should be presumed to be accidental, but that is not what the law requires. Accordingly, viewing the facts in the light most favorable to the prosecution, it is not difficult to conclude that the court of appeals correctly applied *Jackson* in denying relief on this claim.

10

**C. Ineffective Assistance of Trial Counsel**

Starkweather alleges his trial counsel was ineffective because he failed to properly advise him to testify during Phase I of the trial. This claim was discussed above. Starkweather also asserts that trial counsel was ineffective for failing to use evidence that Demery had been dead for several hours by the time the police arrived on the scene. This particular claim is based on information he obtained from his mother Jean Starkweather. Ms. Starkweather claims that an investigator named Koser told her he saw Demery's body after her son's arrest and thought, from the color of the body, that it looked like Demery had been dead for some time. She passed the information on to trial counsel, but he failed to present it.

Starkweather believes trial counsel should have presented Koser's testimony at the trial to contradict the testimony of police witnesses, who all said Demery's blood looked fresh. If the jury had reason to believe Demery might have been killed earlier, it could have believed Starkweather's theory that Demery had been shot the night before. The trial court, in reviewing Starkweather's claim that postconviction counsel was ineffective for failing to argue that trial counsel was ineffective, found that Jean Starkweather's testimony on the point "very likely would have had some exculpatory value if presented to the jury . . . since it would have helped bolster the argument that Mr. Demery had been killed much earlier than the defendant's shooting spree." (Petition, Ex. 7 at 7-8.) The trial court concluded that trial counsel's failure to present Jean Starkweather's testimony to the jury "may constitute deficient conduct." (*Id.* at 14.)

The trial court found no prejudice, however, either from trial counsel's failure to introduce the evidence or from appellate counsel's failure to impugn trial counsel's performance on that same point.

11

> While the statement from Inspector Koser may have some exculpatory value, it is vague, the credibility of the witness, Mrs. Starkweather, is questionable, and it was contradicted by an overwhelming amount of evidence. It is unlikely that presenting this testimony would result in a reasonable probability that the confidence in the outcome of the trial would be undermined; therefore, no prejudice.

(*Id.* at 9.)

The court of appeals affirmed, and took it a step further. That court concluded that such evidence would have been useless to Starkweather, or even contradictory. In that court's view, the time of Demery's death was not a legitimate issue because Starkweather's principal defense was that Demery was shot by the police in the shootout, and that the police then covered up the shooting. As such, the time of Demery's death could not have been the night before, as Starkweather now claims, and evidence that Demery had died earlier would directly undercut his theory that the police shot Demery. (Petition, Ex. 8 at ¶ 8.)

Starkweather castigates the decision of the court of appeals as "irrational" because he asserts his defense at trial was not limited to a claim that the police had shot Demery. As such, the evidence about Demery's time of death would conceivably have been material to Starkweather's defense (as the trial court found) that Demery had been shot by someone else the night before.[4] Even accepting this criticism of the appellate court's conclusion, the fact remains that the trial court

---

[4] At this stage of the proceedings, this court is extremely far-removed from what Starkweather's defense actually was on this point. The petitioner takes the court of appeals to task for its conclusion, and indeed it is not clear how the court of appeals reached that conclusion. The trial court, after all, did not think the evidence was completely inapplicable. The respondent cites the court of appeals decision without explaining how that court determined what Starkweather's defense theory was, and it provides no independent basis for this court to conclude that the court of appeals viewed the evidence correctly. As set forth herein, it seems more prudent to resolve the claim on the basis that the state trial court set forth – that the evidence might have been relevant but its absence was not prejudicial – rather than attempt to reconstruct Starkweather's trial defense on the basis of the bare record.

12

– the court that presided over Starkweather's trial – found no prejudice from the failure to introduce Jean Starkweather's evidence. That decision was not an unreasonable application of *Strickland*'s prejudice prong, and it is that decision to which I will defer under § 2254(d). *Edwards v. Lamarque,* 475 F.3d 1121, 1135 (9th Cir. 2007) ("When a state trial court reaches a reasoned conclusion that the appellate court subsequently does not address, traditionally we have treated the trial court's determination as the last reasoned decision.")

As noted, the state trial court found no prejudice because the evidence was overwhelming, the witness – the defendant's mother – was biased, and the proffered testimony itself was exceptionally vague. Taking the last point first, it was not unreasonable for the trial court to conclude that the proffered testimony was vague. Assuming the obvious hearsay objection could be overcome, the investigator merely stated, assuming Ms. Starkweather's statement would be believed, that the victim's color looked like he had been there awhile. In the face of the testimony of the officers who arrived on the scene and testified that the victim's blood was fresh, the investigator's bare statement about the victim's "color" was hardly compelling evidence.[5] Without any foundation to believe the investigator had some knowledge or experience about such matters, even its admissibility is questionable. Similarly, the evidence was indeed overwhelmingly against Starkweather's theory of the case. As the court of appeals noted, the theory his counsel offered would have been far superior to the theory that Starkweather – a man in the midst of a shooting spree – just happened to stumble upon *another* murder scene on the property and found his friend murdered by an unknown assailant. The victim, moreover, was killed by the very weapon

---

[5] Jean Starkweather's affidavit to this effect is found in the Answer, Ex. H at App. 63. (Dkt. # 9.)

13

Starkweather had just taken from his father's house, which was found at Starkweather's feet. Thus, even if the evidence would have been introduced, it would only have supported a very bizarre version of events that a jury would not reasonably have believed. The state court's conclusion is thus not an unreasonable application of *Strickland*.

**D. Ineffective Assistance of Post-Conviction Counsel**

Petitioner's current counsel can envision "no possible rational grounds" for the decisions made by Starkweather's two appellate lawyers. (Petitioner Br. at 37.) Apparently, just like every other lawyer or judge who has addressed Starkweather's claims in the last ten years, his appellate lawyers "simply did not see the issues." (*Id.*)[6] The issues they should have seen are primarily the ones I have addressed above: ineffective assistance of trial counsel for his failure to have petitioner testify in Phase I and failure to introduce Jean Starkweather's testimony. Appellate counsel was also allegedly ineffective for failing to raise the insufficiency of the evidence argument.

In addition to the claims I have already implicitly rejected, petitioner claims appellate counsel was ineffective for failing to argue that Starkweather should have received a lesser-included offense instruction. The question of how Wisconsin courts treat lesser-included offenses is not, on

---

[6] The nature of proceedings like this lends itself to criticisms of prior counsel's performance as well as criticisms of all of the other judges who have addressed the petitioner's case. Petitioner's criticisms seem excessive, however, and needlessly distract from the issues presented. For instance, it is one thing to argue that a court erred, but to claim repeatedly that a state court of appeals was "irrational" is needless hyperbole. Petitioner has also leveled sharp criticisms at the state attorney general's office throughout. The harshness of the critiques has resulted in some irony, however. Specifically, in the ten years of appeals, it seems the only other time any judge or attorney (other than petitioner's current counsel) has been *correct* is when that lawyer or judge criticized the performance of another attorney in a way that aids petitioner's current petition. That is, according to the petitioner, the court of appeals has always got it wrong in this case, *except* when it was criticizing appellate counsel's performance. And the state AG's office has been atrocious, petitioner believes, but he nevertheless proudly quotes the AAG's brief in the court of appeals when the brief criticizes appellate counsel's performance.

14

its own, a matter of federal or constitutional law. But petitioner is basing his claim on ineffective assistance of counsel, and that does raise Sixth Amendment principles even though the allegation of ineffectiveness rests on a matter of state law. *Perry v. McCaughtry,* 308 F.3d 682, 688 (7th Cir. 2002).

Petitioner's claim is weak. He asserts that the trial judge should have allowed the jury to consider the lesser-included offense of reckless homicide of Demery in addition the charge of intentional homicide. Because his two appellate lawyers failed to argue this on appeal, their performance was allegedly deficient. Under state law, an instruction on a lesser-included offense should be given when there are reasonable grounds in the evidence both for acquittal of the greater charge and conviction on the lesser one. *State v. Wilson,* 149 Wis.2d 878, 440 N.W.2d 534, 542 (1989).

As noted above, Starkweather's defense to the First Degree Intentional Homicide charge was that he did not shoot Demery, not that he accidentally shot him. And of course, the shooting occurred in the midst of a shooting rampage when he was searching for his other friend to finish him off. To argue that the shooting of Demery was merely reckless, rather than intentional, would have been difficult. It also would have required a fantastical leap of speculation. Moreover, the evidence showed that Demery was shot in the face at extremely close range (less than a few feet). Not surprisingly, in reviewing petitioner's ineffective assistance claims, the court of appeals concluded that there was no reasonable view of the evidence that would support a guilty verdict for a reckless homicide charge and cast reasonable doubt on a first-degree intentional homicide charge. (Petition, Ex. 2 at 2; Ex. 5 at 2.) This conclusion was not an unreasonable application of *Strickland*.

15

## III. CONCLUSION

For the reasons given above, I conclude that the state courts' resolution of the issues presented did not involve an unreasonable application of any controlling Supreme Court precedent, nor did it involve an unreasonable determination of any facts. 28 U.S.C. § 2254(d). Given my ruling above, I need not address the issue of procedural default and thus the motion to expand the record is **DENIED** as moot. The petition is **DISMISSED**.

**SO ORDERED** this   29th   day of April, 2008.

                                        s/ William C. Griesbach
                                        William C. Griesbach
                                        United States District Judge

16

Case 1:07-cv-00513-WCG   Filed 04/29/08   Page 16 of 16   Document 40